IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

OREN PROTER, et al.,              :

    Plaintiffs,                   :

v.                                :       Civil Action No. GLR-11-720

MEDIFAST, INC., et al.,           :

    Defendants.                   :

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants', Medifast, Inc. ("Medifast" or the "Company"), Bradley T. MacDonald, Michael S. McDevitt, Margaret E. MacDonald-Sheetz, and Brendon N. Connors (collectively "Individual Defendants"), Motion to Dismiss. (ECF No. 28). Plaintiffs Robert Walkoski and Howard Pavony (collectively the "Lead Plaintiffs"), have brought a consolidated class action alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a) (2012), and Securities Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5 (2012). (ECF No. 25). The lawsuit is brought on behalf of all persons who purchased the common stock of Medifast between March 4, 2010, and March 31, 2011 (the "Class Period").

At issue in this threshold dismissal motion is whether, under the pleading standards set forth in the Private Securities Litigation Reform Act of 1995 (the "PSLRA") § 101(b), 15 U.S.C.

§ 78u-4 (2012), the Complaint supports a "strong inference" that Medifast's statements concerning its earnings and internal accounting controls related to revenue recognition and taxes were made with scienter.  The issues have been fully briefed and no hearing is necessary.  See Local Rule 105.6 (D.Md. 2011).

The Court concludes that Medifast's Motion to Dismiss must be granted in its entirety because, viewed collectively, Lead Plaintiffs' allegations fail, at their inception, to raise a strong inference of scienter.

## I.   BACKGROUND[1]

### A.   Medifast's Rapid Growth and Period of Transition

Medifast is a diet company that manufactures, distributes, and sells weight-loss food products and dietary supplements under several brand names, including Medifast, Take Shape for Life, Hi-Energy Weight Control Centers, and Woman's Wellbeing. The Company also offers supervised weight-loss programs at its Medifast Weight Control Centers in several states across the country, which are either owned or franchised by Medifast.  It operates through five wholly-owned subsidiaries and its business is divided into three primary distribution channels.

---

[1] Unless otherwise noted, the following facts are taken from the Amended Complaint.  The well-pled allegations in the Amended Complaint are accepted as true and viewed in the light most favorable to Lead Plaintiffs.  See Brockington v. Boykins, 637 F.3d 503, 505 (4th Cir. 2011).

The Company's stock has been listed on the New York Stock Exchange since 2006. From 2006 and throughout the Class Period, Medifast experienced remarkable success. Its net income for 2007 and 2008 remained relatively stable, climbing from $3.4 million to more than $4.8 million, respectively. In 2009, however, Medifast's profits more than doubled to exceed $11 million. Analysts consistently praised Medifast for its substantial sales and profits, and forecasted significant growth in Medifast's revenues, earnings, and earnings per share ("EPS"). To be sure, by 2010, the Company's net income had grown to nearly $20 million. As a result, Medifast was ranked 29th on Fortune Magazine's 2010 "100 Fastest-Growing Companies" list in August 2010.

Lead Plaintiffs contend, however, that due to Medifast's rapid growth, the Company lacked internal controls that were adequate to maintain reliable financial reporting and ensure compliance with applicable laws and regulations. Compounding the ordinary problems that attend rapid growth, in the timeframe leading up to and including the Class Period, Medifast was in the process of transitioning from its longtime external auditor, Bagell, Josephs, Levine & Company, LLP ("Bagell").

In December 2009, Bagell announced that effective January 1, 2010, it would combine with another auditing firm, Friedman, LLP ("Friedman"). Medifast was informed that Friedman, not

3

Medifast's longtime auditor Bagell, would be the surviving entity. Because this turn of events was announced and executed during Medifast's annual audit for fiscal year ("FY") 2009, Medifast continued with Friedman through April 14, 2010. Thereafter, on April 16, 2010, Medifast filed a Form 8-K with the SEC, announcing it had determined that Freidman would not be a good fit for the Company, and dismissed the firm, hiring McGladrey & Pulley ("McGladrey") to perform audit and tax services effective April 14.

Medifast explained that it did not have any disagreements with Friedman on any matter of accounting principles or practices and, on April 29, 2010, Friedman confirmed Medifast's statements in its own letter attached to Medifast's subsequently filed Form 8-K/A. Medifast noted that despite Bagell's takeover by Friedman, the Company had elected to stay with Friedman long enough to complete its 2009 audited financial statements.

It was during this period of growth and transition that Medifast discovered errors in its accounting practices. In sum, Medifast proffers a benign, non-fraudulent explanation for the Company's series of misstatements beginning on March 4, 2010: the Company's rapid growth, coupled with the transition between outside accountants, resulted in insufficient outside financial guidance and necessitated restatements of the Company's financials.

B.    **The March 4, 2010 Press Release**

On March 4, 2010, Medifast announced its fourth quarter and year-end financial results for the period ended December 31, 2009.  The announcement was made in a press release, sub-titled "Medifast Bucks Industry Trend to Report Highest Revenues of the Year in the Seasonally Slowest Diet Quarter . . . [,]" and annexed as an exhibit to a Form 8-K filed with the SEC (the "Press Release").    The Form 8-K was signed by Defendant McDevitt, who, at the time, served as CEO and CFO of the Company.

For the year ended December 31, 2009, Medifast reported a revenue increase of 57% from the $105.4 million reported for the year ended December 31, 2008.   The Company also reported net income of $12.0 million, versus $5.4 million in 2008.   Perhaps most significantly, Medifast also disclosed the following amounts related to deferred taxes:

|  | At December 31, 2009 | At December 31, 2008 |
|---|---|---|
| Current portion of deferred tax asset | $329,000 | $100,000 |
| Deferred tax asset, net of current portion | $1,341,000 | $1,131,000 |
|  | $1,670,000 | $1,231,000 |

The Company further disclosed a provision for income taxes for the years ended December 31, 2009 and 2008, of $7,330,000 and $2,415,000, respectively.

Commenting on the fourth quarter and year-end financial results in a conference call (the "Conference Call") with analysts conducted on March 4, 2010, Defendant McDevitt opined that the Company's record growth was attributed in part to the Company prudently managing its corporate expenses. The following day, the market reacted positively to the financial results and Defendant McDevitt's statements, as the price of the Company's stock rose to close at $23.61 per share from the previous day's close of $22.55 per share.

Lead Plaintiffs allege that Defendants issued the financial results in the Press Release and conducted the Conference Call notwithstanding the fact that Medifast's auditor, Friedman, had not yet completed its audit of the Company's financial statements and had raised concerns about Medifast's tax accounting practices, and the effect those computations would have on the Company's financial statements.

In summary, Lead Plaintiffs contend that representations made in the Press Release, and the statement concerning the Company prudently managing its corporate expenses, were materially false and misleading because Defendants knew or recklessly disregarded that, due to its lack of an effective and sustainable internal control system, the Company was using improper accounting practices, which led to inaccurate financial reporting.

C.     **The March 16, 2010 Form NT 10-K Filing**

Twelve days later, on March 16, 2010, Medifast filed with the SEC, on Form NT 10-K, a notification that it was unable "to file its Annual Report on Form 10-K for the year ended December 31, 2009, within the prescribed time period." (Am. Compl. ¶ 40). Medifast stated that the extra time was necessary "because the information required for an accurate and full completion of the report, including but not limited to the financial statements that form a part thereof, could not be provided within the prescribed time period without unreasonable effort or expense." (Id.) Medifast said that it "expect[ed] to file its Annual Report on Form 10-K as soon as practicable, and in no event later than the fifteenth calendar day following the prescribed due date." (Id.) Defendant McDevitt signed the Form NT 10-K.

Lead Plaintiffs allege that at the time of the filing, Defendant McDevitt knew, but failed to disclose, that Medifast could not timely file its annual report because of concerns raised by its auditor about its tax accounting practices, and the effect those computations would have on Medifast's financial statements.

D.     **The First Restatement**

In the Company's annual report on Form 10-K for the year ended December 31, 2009 ("2009 10-K"), filed with the SEC on

March 31, 2010, Medifast announced a restatement of its previously announced financial results for the years ended December 31, 2006, 2007, and 2008.

The Company revealed that the restatement was due to an error in the Statement of Financial Accounting Standards ("SFAS") No. 109 "Accounting for Income Taxes" calculation. Specifically, Medifast disclosed that "[d]uring the audit of the Company's financial statement for the year ended December 31, 2009," Friedman advised "that an error existed in [the Company's] deferred tax account balances due to timing differences resulting between depreciation expense for tax purposes versus financial statement purposes." (Am. Compl. ¶ 41).

This error constituted a material weakness[2] in the Company's preparation and review process of the tax provision, reducing 2008, 2007, and 2006 net income by $601,000, $411,000, and $583,000, respectively. The Company assured investors, however, that it had implemented remedial procedures and tighter internal controls by "hir[ing] a CPA in-house with extensive experience in financial reporting and SFAS No. 109, 'Accounting for Income

---

[2] Medifast defined a "material weakness" as "a deficiency, or a combination of deficiencies, in internal control such that there is a reasonable possibility that a material misstatement of the company's annual financial statements will not be prevented or detected." (Annual Report Form 10-K at 30 (March 31, 2010), ECF No. 28-4).

Taxes.'" (Id.) In addition, the Company promised to have an outside tax advisor review management's tax provision calculations on a quarterly basis.

Unbeknownst to investors, however, the Company's internal controls were not effective and operating so as to prevent improper accounting, and were otherwise materially deficient. Lead Plaintiffs argue, for example, that Defendants falsely set forth the Company's revenue recognition policy.[3] Specifically, Lead Plaintiffs allege that, during the Class Period, Defendants knew or recklessly disregarded that, in violation of Generally Accepted Accounting Principles ("GAAP"), Medifast, among other things, accounted for expenses using a cash method instead of an accrual method and recognized revenue that was not yet earned. These GAAP violations, Lead Plaintiffs assert, allowed the Company to report false revenue, profits, costs, liabilities, earnings, and stock holder equity.

Although the price of Medifast's stock closed at $25.43 on April 1, 2010, up from the previous day's close of $25.13, Lead Plaintiffs contend that, but for the restatement, the price of Medifast common stock would have increased further.

---

[3] Medifast disclosed that "[r]evenue is recognized net of discounts, rebates, promotional adjustments, price adjustments, returns and other potential adjustments upon shipment and passing of risk to the customer and when estimates of are reasonably determinable, collection is reasonably assured and the Company has no further performance obligations." (Annual Report Form 10-K at 20, 65 (March 31, 2010)).

Nine months thereafter, on January 12, 2011, the Company filed an Amended 2009 10-K ("2009 10-K/A") "to address comments received from the staff of the [SEC] relating to the Original Report." (Am. Compl. ¶ 96).  The Company included, among other things, additional disclosures under the section "Changes in our Internal Control" denoting that there were changes in its internal controls over financial reporting and providing "additional detail on the changes in internal controls designed to remediate a material weakness." (Id.)  The Company did not otherwise amend, update or modify the original 2009 10-K.

**E.**   **The 2010 Quarterly Financial Reports**

In addition to providing annual reports on Form 10-K, Medifast filed quarterly financial reports with the SEC on Form 10-Q.  Along with each Form 10-K and 10-Q, the Individual Defendants signed Sarbanes-Oxley certifications indicating that the reports did "not contain any untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report . . . ." (Am. Compl. ¶ 59).  Relevant to the Class Period, Defendants filed Forms 10-Q on three occasions: May 5, 2010; August 9, 2010; and November 9, 2010.

Lead Plaintiffs allege that by signing the Sarbanes Oxley certifications, the Individual Defendants falsely misrepresented

that the Forms 10-K and 10-Q were true in all material respects. Specifically, Lead Plaintiffs assert that Defendants knew or recklessly disregarded that: (1) the remediation efforts relating to the material weakness surrounding the income tax process were ineffective and unsustainable; (2) Medifast lacked internal expertise and resources to ensure that the preparation and review process for the calculation of the tax provision was properly formed; (3) Medifast lacked internal resources to monitor its financial close process effectively; and (4) Medifast was improperly recognizing program fees as earned revenue upon billing or receipt of a customer's initial fee.

## F.    The Second Restatement

Medifast's Form 10-K for the year ended December 31, 2010, was due March 16, 2011.   The Company filed a Form 12b-25 Notification of Late Filing on March 11, 2011, however, which extended its time to file by fifteen days.   The Company disclosed in a press release on the same day that it would need "additional time . . . to review the recognition of certain expenses in prior periods."  (Am. Compl. ¶ 111).

On March 11, 2011, after the announcement of delayed fourth quarter and full-year 2010 financial results, the Company's shares fell 24%, to close at $16.63 per share from $21.90 per share the day before.   Six days thereafter, Lead Plaintiffs initiated this action alleging securities fraud.

When Medifast finally filed its Form 10-K for FY 2010 (the "2010 10-K") on April 1, 2011,[4] the Company disclosed that it was once again restating earnings, among other financial metrics, for the years ended December 31, 2008 and 2009. Beginning retained earnings as of January 1, 2008, were also restated.

Medifast's restated financial statements for the year 2008, in pertinent part, are summarized in the following chart[5]:

| Financial Metrics | As Originally Reported | As Restated | $ Change |
|---|---|---|---|
| Revenue | $110,219,000 | $110,076,000 | ($143,000) |
| Cost of Sales | 30,885,000 | 30,986,000 | 101,000 |
| Selling, general, and administration | 71,135,000 | 71,723,000 | 588,000 |
| Provision for income taxes | 3,016,000 | 2,707,000 | (309,000) |
| Net income | 4,834,000 | 4,311,000 | (523,000) |
| Basic earnings per share | 0.37 | 0.33 | (0.04) |
| Diluted earnings per share | 0.34 | 0.30 | (0.04) |

---

[4] Plaintiffs allege that Medifast filed its 2010 10-K on March 31, 2010. (See Am. Compl. ¶ 113). This date is likely incorrect, however, and is belied by the fact that the actual 2010 10-K notes April 1, 2011, as its filing date. (Annual Report Form 10-K at 2 (April 1, 2011), ECF No. 28-3).

[5] (See Annual Report Form 10-K at 84 (April 1, 2011), ECF No. 28-3).

The restated financial statements for the year 2009, in pertinent part, are also summarized below[6]:

| Financial Metrics | As Originally Reported | As Restated | $ Change |
|---|---|---|---|
| Revenue | $169,912,000 | $169,743,000 | ($169,000) |
| Cost of Sales | 45,194,000 | 45,355,000 | 161,000 |
| Selling, general, and administration | 105,352,000 | 105,891,000 | 539,000 |
| Provision for income taxes | 7,330,000 | 7,067,000 | (263,000) |
| Net income | 11,963,000 | 11,357,000 | (606,000) |
| Basic earnings per share | 0.89 | 0.84 | (0.05) |
| Diluted earnings per share | 0.81 | 0.77 | (0.04) |

After a "detailed review of expense recognition of certain ordinary course of business expenses for the year's [sic] 2008 and 2009," the Company disclosed that "a material weakness in [its] internal control over financial reporting" caused the restatement of such expenses.  (Am. Compl. ¶ 115).

Lead Plaintiffs allege that part and parcel of Defendants' deficient and erroneous financial reporting was their failure to (1) properly accrue certain obligations at the end of accounting periods, which caused Medifast to overstate its net income and understate its expenses; (2) perform a review of ending liability balances for costs and expenses; and (3) properly recognize revenue from customers who paid up front in the Medifast Weight Control Centers.  In addition to weaknesses in the control over financial reporting, Defendants admitted that

---

[6] (Id.)

13

the remediation efforts concerning the accounting of income taxes were ineffective and that new measures were being implemented to correct this material control weakness.

With the disclosures in the 2010 10-K, the price of the Company's stock closed at $18.01 per share on April 1, 2011, down from the previous day's close of $19.75 per share. On the following Monday, April 4, 2011, the stock fell even further, closing at $16.58 per share, and then at $15.95 per share the next day.

On July 19, 2011, this Court granted Lead Plaintiffs leave to file an Amended Complaint to, among other things, incorporate the additional information provided in the Company's 2010 10-K. Incorporating the restated financial information, Lead Plaintiffs allege that Defendants knowingly or recklessly misstated Medifast's financial condition during the Class Period in violation of the Exchange Act.

The Amended Complaint also contains allegations of insider trading. Lead Plaintiffs allege that on January 5, 2011, the Individual Defendants collectively sold 180,000 shares of Company stock: (1) Defendant McDevitt sold 95,000 shares of his Medifast stock at $27.88 per share for proceeds of $2,648,600; (2) Defendant Connors sold 20,000 shares of his Medifast stock at $29.13 per share for proceeds of $582,600; (3) Defendant Sheetz sold 15,000 shares of her Medifast stock at $29.07 per

share for proceeds of $436,050.   In addition, she disposed of another 10,000 shares of Company stock, also at $29.07 per share, for proceeds of $290,700; and (4) Defendant MacDonald sold 50,000 shares of Company stock at $28.72 per share for proceeds of $1,436,000.

On November 18, 2011, Defendants filed a Motion to Dismiss on the grounds that Lead Plaintiffs failed to plead scienter under the PSLRA adequately.   (ECF No. 28).   Lead Plaintiffs filed a Response in Opposition on January 1, 2012 ("Pls.' Opp'n") (ECF No. 29), and Defendants filed their Reply on February 16, 2012.   (ECF No. 32).

## II.   DISCUSSION

### A.   Motion to Dismiss Standard of Review

#### 1.   In General

The purpose of a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the legal sufficiency of a complaint.   Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999).   Pursuant to Federal Rule of Civil Procedure 8(a)(2), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations and internal quotation marks omitted).

15

In considering a Rule 12(b)(6) motion, this Court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true. See Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 783 (4th Cir. 1999). However, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555). A complaint is also insufficient if it relies upon "naked assertions devoid of further factual enhancement." Iqbal, 556 U.S. at 678 (citations and internal quotation marks omitted).

A complaint must allege sufficient facts to "cross 'the line between possibility and plausibility of entitlement to relief.'" Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Twombly, 550 U.S. at 557); see also Simmons v. United Mortg. & Loan Inv., LLC, 634 F.3d 754, 768 (4th Cir. 2011) ("On a Rule 12(b)(6) motion, a complaint must be dismissed if it does not allege enough facts to state a claim to relief that is plausible on its face.") (citations and internal quotation marks omitted).

A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 555 U.S. at 556).  Thus, if the well-pled facts contained within a complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." <u>Francis</u>, 588 F.3d at 193 (quoting <u>Iqbal</u>, 556 U.S. at 679) (citations and internal quotation marks omitted).

### 2. Heightened Pleading for Fraud

Where, as here, a claim alleges fraud or mistake, a party must "state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b).  To satisfy Rule 9(b)'s heightened pleading standard, a plaintiff must allege facts establishing the "who, what, when, where, and how" of the claimed fraud.  <u>United States ex rel. Wilson v. Kellogg Brown & Root, Inc.</u>, 525 F.3d 370, 379 (4th Cir. 2008) (citations and internal quotation marks omitted).  More specifically, courts under the United States Court of Appeals for the Fourth Circuit have established that:

> To state a fraud claim under Maryland law, a plaintiff must allege five elements with particularity: (1) the defendant made a false statement of fact; (2) the defendant knew the statement was false or acted with reckless disregard for the truth of the statement; (3) the defendant made the statement for the purpose of defrauding the plaintiff; (4) the plaintiff reasonably relied on the false statement; and (5) the plaintiff was damaged as a result.

Thompson v. Countrywide Home Loans Servicing, L.P., No. L-09-2549, 2010 WL 1741398, at *3 (D.Md. Apr. 27, 2010); In re Medimmune, Inc. Sec. Litig., 873 F.Supp. 953 (D.Md. 1995) (citing Martens Chevrolet, Inc. v. Seney, 439 A.2d 534 (Md. 1982)).

"In evaluating whether a cause of action must be pled with particularity, a court should examine whether the claim requires an essential showing of fraud." Balt. Cnty. v. Cigna Healthcare, 238 F.App'x 914, 921 (4th Cir. 2007) (citations omitted).  It is axiomatic that claims brought pursuant to the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and  SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, are subject to Rule 9(b).  See Cozzarelli v. Inspire Pharm., Inc., 549 F.3d 618, 629 (4th Cir. 2008).

### 3.  Securities Fraud Actions

Iqbal and Twombly notwithstanding, to survive a threshold dismissal motion, a securities fraud complaint must do more than state a facially "plausible" claim.  A special pleading standard applies to certain elements of a securities fraud claim brought under Section 10(b) of the Exchange Act.  To succeed in a Section 10(b) private suit, a plaintiff must prove:

> (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation (that is, the economic loss must be proximately caused by the misrepresentation or omission).

Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc., 576 F.3d 172, 181 (4th Cir. 2009) (citing Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008)).

Prior to the enactment of the PSLRA, the heightened pleading standard set forth in Rule 9(b) was the principle mechanism used to determine the sufficiency of a complaint for securities fraud under Section 10(b) of the Exchange Act. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007).  In 1995, Congress strengthened and clarified the particularity requirement vis-à-vis federal securities class action lawsuits.  Thus, under the PSLRA, to survive a motion to dismiss, a complaint for violation of the federal securities laws must meet the heightened requirements set forth under 15 U.S.C. § 78u-4(b).  Matrix, 576 F.3d at 181-82.

First, any private securities complaint alleging that the defendant made a false or misleading statement must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]"  15 U.S.C. § 78u-4(b)(1).  Second, with respect to each act or omission, the plaintiff must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A) (emphasis added).

Construing this standard, the Supreme Court of the United States has held that it must be ascertained "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets [the strong-inference] standard." Tellabs, 551 U.S. at 323 (emphasis in original). To be sure, as has been laconically observed in other contexts, "a brick is not a wall." See Advisory Committee's Note, Fed.R.Evid. 401 (2012). Thus to be "strong" such an inference of scienter must be more than "permissible" or "reasonable," "it must be cogent and compelling" compared to other, nonculpable explanations. Tellabs, 551 U.S. at 324.

It follows then that, under the comparative analysis set forth in Tellabs, the threshold inquiry for a court is whether the facts alleged "permit an inference of scienter, and if so, the persuasiveness of that inference." Matrix, 576 F.3d at 183. Next, if the court finds the inference that the defendants "acted innocently, or even negligently, more compelling than the inference that they acted with the requisite scienter," the complaint should be dismissed. Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP, 551 F.3d 305, 313 (4th Cir. 2009).

Under the strong inference standard, negligence is insufficient to support a Section 10(b) claim. Id. To establish a strong inference of scienter "plaintiffs must do

more than merely demonstrate that defendants should or could have done more." Id. at 314. Indeed, "Congress did not merely require plaintiffs to . . . allege facts from which an inference of scienter rationally *could* be drawn." Tellabs, 551 U.S. at 323 (emphasis in original). Rather, plaintiffs must allege scienter by pleading intentional misconduct or severe recklessness. Cozzarelli*,* 549 F.3d at 623.

In the Section 10(b) context, a reckless act is one that is "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Pub. Emps.' Ret. Ass'n*,* 551 F.3d at 313 (citation and internal quotation marks omitted). Nevertheless, "when the facts as a whole more plausibly suggest that the defendant acted innocently—or even negligently—rather than with intent or severe recklessness, the action must be dismissed." Cozzarelli*,* 549 F.3d at 624.

Furthermore, where, as here, plaintiffs allege fraud claims against individual defendants, they "must allege facts supporting a strong inference of scienter as to each defendant." Matrix*,* 576 F.3d at 182 (citation omitted). "[I]f the defendant is a corporation, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one

21

authorized agent of the corporation, since corporate liability
derives from the actions of its agents." Teachers' Ret. Sys. of
La. v. Hunter, 477 F.3d 162, 184 (4th Cir. 2007) (citation
omitted).

**B.     Analysis**

    **1.     Allegations Evincing Scienter**

At this stage, the parties do no dispute that public
statements made by the Individual Defendants on behalf of
Medifast were erroneous.  The Fourth Circuit has held that the
misstatement element is satisfied "[i]f a reasonable investor,
exercising due care, would gather a false impression from a
statement, which would influence an investment decision[.]"
Phillips v. LCI Int'l, Inc., 190 F.3d 609, 613 (4th Cir. 1999)
(citation omitted).  Accordingly, Medifast concedes—as it must—
that "the issue before this Court is not *whether* Defendants were
furnished with erroneous financial data—the restatements make it
clear that they were."  (Defs.' Mot. to Dismiss at 20, ECF No.
28-1) (emphasis in original); see In re Computer Scis. Corp.
Sec. Litig., No. 1:11cv610, 2012 WL 3779349, at *7 (E.D.Va. Aug.
29, 2012) (finding that the complaint adequately pled the
misstatement element of a securities fraud claim where
defendants issued a restatement); see also In re FirstEnergy
Corp. Sec. Litig., 316 F.Supp.2d 581, 595 (N.D.Ohio 2004)
("[T]he purpose of a restatement is to correct an error in a

previously-issued financial statement.    By definition . . . a restatement says that the prior statement was false.").    There is, therefore, at this stage, no dispute that the Amended Complaint adequately pleads the misstatement element of a securities fraud claim.    The issue is rather, whether prior to the issuance of the erroneous financial data, Defendants had information that would have allowed them to discern that the financial data were wrong.

To this end, Lead Plaintiffs posit a veritable decathlon of allegations, the sum total of which, they believe, give rise to a cogent and compelling inference that Medifast and the Individual Defendants misled the market intentionally or with severe recklessness.    Specifically, Lead Plaintiffs allege the following indicia of scienter:

> (1)  Defendant McDevitt's issuance of the March 4, 2010 Press Release and facilitation of the related Conference Call, despite Friedman not having yet completed its audit of the Company's financial statements and raising concerns about how the Company accounted for income taxes. (Am. Compl. ¶¶ 31-38).
>
> (2)  Defendant McDevitt's omission in the March 16, 2010 Form NT 10-K filing that Medifast could not timely file its annual report because of concerns raised by Friedman regarding how the Company accounted for income taxes.    (Am. Compl. ¶¶ 40-41).
>
> (3)  Individual Defendants' imputed knowledge of the falsity of the financial statements by virtue of their high-level positions within the Company. (Am. Compl. ¶¶ 20-23, 135-36, 157-59).

(4) Medifast's lack of internal controls. (Am. Compl. ¶¶ 52-55, 70, 79, 80, 88-89, 101).

(5) The size, duration, and simplicity of the alleged accounting fraud. (Am. Compl. ¶¶ 115-16, 120, 122-23, 126).

(6) Defendants' McDevitt and Connors Sarbanes-Oxley Act certifications. (Am. Compl. ¶¶ 59-61, 74, 83, 92, 109-10).

(7) The proximity in time between the misstatements and the disclosure of the alleged fraud. (Am. Compl. ¶¶ 96-98, 104-08).

(8) Friedman's dismissal and its disclaimer of responsibility for the 2007 and 2008 financial statements. (Am. Compl. ¶¶ 44, 50-51, 63-67).

(9) Individual Defendants' insider trading. (Am. Compl. ¶¶ 137-40).

The Court concludes that, upon close inspection, these allegations, even taken together, fail to make the culpable inference that the Individual Defendants actually knew about, or at least recklessly disregarded, the accounting problems before the false public statements were made. Instead, the Court finds that the particularized facts Lead Plaintiffs allege support a single, cogent narrative: the Company experienced exponential growth, and in that time of transition, accounting errors resulted.

Deconstructing the above list, Lead Plaintiffs' allegations can be neatly sorted into four categories. The first category contains allegations (¶¶ 1-3) that are antecedent to the 2009

24

and 2010 Forms 10-K.  The second category contains allegations (¶¶ 4-7) that center around the fact and nature of the restatement itself.  The third category contains allegations (¶ 8) related to the Company's auditors.  In the last category are allegations (¶ 9) that the Individual Defendants' stock sales are indicative of scienter.  Following the standard of review outlined above, each category of allegations is addressed in turn below.

> a.   **Category I – allegations antecedent to 2009 and 2010 Form 10-K restatements**
>
> i.   **The Press Release, Conference call, and Form NT 10-K omission**

Lead Plaintiffs point first to their allegations that "Defendants issued the financial results in the press release and conducted the conference call notwithstanding the fact that . . . Friedman had not yet completed its audit of the Company's financial statements and had raised concerns" about how the Company accounted for income taxes.  (Am. Compl. ¶ 37).  Lead Plaintiffs further argue that the statements made in the Press Release, "and the statement concerning the Company prudently managing its corporate expenses  . . . were materially false and misleading *because* Defendants knew or recklessly disregarded that, due to its lack of an effective and sustainable internal control system, the Company was using improper accounting practices . . . ."  (Id. ¶ 38) (emphasis added).

As a threshold matter, Lead Plaintiffs appear to conflate the legal standard in a securities fraud case.   Whether a statement is materially misleading does not follow from or depend upon the speaker's state of mind.   See Matrix, 576 F.3d at 183 ("Defendants' state-of-mind with respect to the company's internal controls is a question distinct from the critical question here, which is defendants' state-of-mind with respect to misstating or omitting material financial information in [their] financial statements.").

At any rate, Medifast's later tacit admission that the statements were false fails to suggest that Defendants misled the market intentionally or with severe recklessness.   It is of no moment that, at the time of the Press Release and Conference Call, Freidman had raised concerns about the propriety of the Company's income tax accounting during 2006-2008.   The financial statements relevant to FY 2009 do not raise an inference of scienter because they were audited by Friedman.   That is, the "concerns" raised by Friedman were not germane to the FY 2009 statements.   The record indicates that Friedman questioned only the income tax accounting practices relevant to 2006-2008, not 2009.

Even in instances where Defendants misstate data relevant to FY 2008 in the Press Release, there is nothing in the record to support the notion that this was done intentionally or with

severe recklessness.   While it is true that Medifast implemented remedial measures one month prior to issuing the Press Release, it is also true that (1) Bagell had audited and certified the correctness of Medifast's income tax accounting for 2006-2008, and (2) Lead Plaintiffs do not adequately allege facts indicating that Defendants had information that would have allowed them to discern that the FY 2008 financial data were wrong.[7]   Lead Plaintiffs' allegations regarding the statement made during the Conference Call and the omission in the March 16, 2010 Form NT 10-K filing fail for the same reasons.

### ii.   Individual Defendants' high-level positions

Lead Plaintiffs also endeavor to plead scienter on the basis that Defendants knew or recklessly disregarded accounting errors because of their positions with Medifast.   Specifically,

---

[7] Lead Plaintiffs allege that "Defendants admitted that they knew or recklessly disregarded that the Company employed improper accounting procedures when creating financial statements, which were the cause of the restatement."   (Am. Compl. ¶ 11).   This allegation is patently false, however, and belied by Defendants' repeated contention that Lead Plaintiffs fail to "allege *what* Defendants knew about Medifast's accounting errors or *when* they knew it."   (See Defs.' Mot. to Dismiss at 2, 9, 14, 20) (emphasis added).   In any event, such an allegation, without other particularized facts, fails to raise an inference of scienter.   See In re Constellation Energy Grp., Inc. Sec. Litig., 738 F.Supp.2d 614, 636 (D.Md. 2010) (noting that a plaintiff's circular logic cannot substitute for a specific factual allegation that the defendants discovered the mistake before the misstatement); In re Coventry Healthcare, Inc. Sec. Litig., No. 08:09-CV-2337-AW, 2011 WL 1230998, at *11 (D.Md. Mar. 30, 2011) (finding no inference of scienter where the amended complaint did not give the Court a precise timeline of when and how defendants knew of errors).

Lead Plaintiffs contend that the "fraudulent scheme described in [the] Complaint could not have been perpetrated without the knowledge and complicity of the personnel at the highest level of the Company, including each of the Individual Defendants," (Am. Compl. ¶ 136), and that "by virtue of their . . . associations with the Company which made them privy to confidential proprietary information concerning Medifast," Defendants "participated in the fraudulent scheme" supposedly identified in the Amended Complaint. (Id. ¶ 135).

Such generic pleading, however, is insufficient to raise a strong inference of scienter.  In re Criimi Mae, Inc. Sec. Litig., 94 F.Supp.2d 652, 661 (D.Md. 2000) ("[A] general inference that, because of their positions with [the company], Defendants 'must have known' . . . is inadequate to withstand the special pleading requirements in securities fraud cases."); Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co., 432 F.Supp.2d 571, 592 (E.D.Va. 2006) (holding that plaintiff failed to allege a strong inference of scienter based on the individual defendants' executive position because "holding an executive position alone does not necessarily lead one to infer that Individual Defendants knew that the alleged omissions were false or misleading").

Furthermore, the logic of Defendants' actions militates against a finding of scienter.  Specifically, if, as Lead

28

Plaintiffs allege, certain Individual Defendants knew of a misapplication that resulted in a higher stock price, then Defendants would not likely have chosen to replace Friedman and expose Medifast's financial records to yet another new auditor, McGladrey.  Thus, Defendants' switch to McGladrey would seem to support an inference that Defendants did not make the false statements with scienter and that the accounting errors were just that.

At bottom, given the larger context, the foregoing bare allegations, without other particularized facts, do not give rise to a strong inference of scienter.

### b. Category II - allegations revolving around the fact and nature of the restatements

#### i. Lack of internal controls

Lead Plaintiffs next allege that Defendants' lack of internal controls over income tax and financial reporting raises a strong inference of scienter.  For example, Lead Plaintiffs cite to In re Royal Ahold N.V. Sec. & ERISA Litig., 351 F.Supp.2d 334, 378 (D.Md. 2004), for the principle that the lack of internal controls is probative of scienter.

In Royal Ahold, plaintiffs alleged, with particularity, that certain insiders: (1) had received notice from the defendant company's independent auditor that the company's financial statements, incorporated into SEC filings, were false;

(2) had concealed material information from the independent auditor; (3) kept two separate sets of accounting books, one to submit to the auditors and one "real" set; and (4) admitted that the company had created "fraudulent receivables." Id. at 373-80.  It was under such circumstances that this Court observed that internal problems "contribute[d] to a strong inference of scienter." Id. at 378.

Here, Lead Plaintiffs merely allege that "Defendants' failure to correct the material weakness, when they knew of the same material weakness, demonstrates that their Class Period statements concerning the procedures purportedly implemented to remediate this weakness were knowingly false or misleading or recklessly made." (Pls.' Opp'n at 13).  This argument fails, however, because to establish a strong inference of scienter "plaintiffs must do more than merely demonstrate that defendants should or could have done more." Pub. Emps.' Ret. Ass'n, 551 F.3d at 314.

Lead Plaintiffs cite also to Matrix for the proposition that a "strong inference of scienter might arise [with respect to false financial statements] when there are sufficient red flags to alert senior officers to the unreliability of statements about internal controls." See Matrix, 576 F.3d at 188.  Lead Plaintiffs' reliance on Matrix is similarly misplaced.

In Matrix, plaintiffs alleged that it was widely known that defendants' financial reporting system responsible for tracking revenues, expenses, and employee time was unreliable and failed to properly integrate accounting systems used in foreign offices. Id. at 184.  Indeed, the Court found that defendants' employees had manually bypassed the financial reporting system, which presumably created the risk of human error and fraud. Id. Given the known and pervasive deficiency in defendants' financial reporting system, it is unsurprising that the Fourth Circuit permitted an inference of scienter regarding the lack of internal controls.

In this case, however, Lead Plaintiffs fail to plead any allegations approaching the level of specificity in Matrix. Instead, Lead Plaintiffs merely conclude that the lack of internal controls related to financial reporting raises a strong inference of scienter because Defendants "were on notice of other weaknesses (e.g., the tax issues) as a result of [the 2009 10-K]." (Pls.' Opp'n at 14).  This allegation is clearly distinguishable from the widespread deficiency in Matrix, which was recognized throughout the company.

Likewise, although Lead Plaintiffs concede that bare allegations of a GAAP violation do not create a strong inference of scienter (Pls.' Opp'n at 17), they argue the misapplication of accounting principles "may ultimately" give rise to a strong

31

inference of scienter when united with other circumstances indicative of fraud. (Id. at 16). Lead Plaintiffs' statement of the law is accurate, but their analysis lacks any of the trademark indicia of scienter discussed in the cases they cite.

In the few cases in which a court has found that GAAP violations supported a strong inference of scienter, a plaintiff has typically alleged one of three associated factual circumstances: (1) that the company's independent accountant was complicit in the fraud;[8] (2) that the auditor had disagreements with the defendant about the company's financials;[9] or (3) that the defendant hid or withheld vital information from its auditors.[10]

Here, Lead Plaintiffs have alleged none of the above indicia of fraud, nor have they alleged specific knowledge on the part of the insiders. Accord Keeney v. Larkin, 306 F.Supp.2d 522, 541 (D.Md. 2003) (concluding that "GAAP

---

[8] See In re Oxford Health Plans, Inc. Sec. Litig., 51 F.Supp.2d 290, 295 (S.D.N.Y. 1999) (cited by Lead Plaintiffs at page 13 of their Opposition); Schnall v. Annuity & Life re (Holdings), Ltd., No. 3:02CV2133 EBB, 2006 WL 2522446, at *5 (D.Conn. Aug. 30, 2006) (cited by Lead Plaintiffs at page 14 of their Opposition); In re MicroStrategy, Inc. Sec. Litig., 115 F.Supp.2d 620, 635, 650 (E.D.Va. 2000) (cited by Lead Plaintiffs at page 17 of their Opposition).

[9] See, e.g., Gelfer v. Pegasystems, Inc., 96 F.Supp.2d 10, 14-15 (D.Mass. 2000) (cited by Lead Plaintiffs at page 16 of their Opposition).

[10] See, e.g., Crowell v. Ionics, Inc., 343 F.Supp.2d 1, 16-17 (D.Mass. 2004) (cited by Lead Plaintiffs at page 12 of their Opposition).

violations can only raise a strong inference of scienter if . . . other allegations evince circumstances suggestive of fraudulent intent"), aff'd, 102 F.App'x 787 (4th Cir. 2004).

### ii. Size, duration, and simplicity of GAAP violations

Lead Plaintiffs attempt to breathe new life into their allegations of scienter with arguments concerning the size, duration, and simplicity of the alleged accounting fraud. These arguments are similarly unavailing, however, for many of the reasons already listed.

First, as to the size of the restatement, Lead Plaintiffs assert that the sheer magnitude of the overstatements in this case is strongly suggestive of scienter and, at the very least, adds to the inference when considered alongside their other allegations.

While Medifast's restatements of net income were material, they are not of the nature that would give rise to a strong inference that they resulted from fraud. They were, for example, far less severe than the restatements made in cases relied upon by Lead Plaintiffs.[11]   In MicroStrategy, the misstatements at issue reported that the company was earning millions of dollars in profits each quarter, when in fact it was losing millions per quarter.   MicroStrategy, 115 F.Supp.2d at

---

[11] See supra Section (I)(F) at 12 for numerical examples.

624–25.   In   total,   the   false   financial   statements   in
MicroStrategy took a company that lost $36.8 million over nearly
a  two-year  period  and  falsely  presented  it  as  a  company  that
earned  profits  of  $18.9  million  over  that  period.   Id.   The
MicroStrategy   court   found   that   the   misstatements   were
"breathtaking"  and  constituted  a  "night-and-day"  difference.
Id. at 636–37.

Second,  Lead  Plaintiffs  are  unpersuasive  in  their  attempt
to   characterize   the   duration   of   the   accounting   errors   as
indicative  of  scienter.   It  is  established  law  in  this  Circuit
that  there  can  be  no  inference  of  scienter  based  solely  on  GAAP
or   other   accounting   errors,   even   when   such   errors   occur
routinely.   See Svezzese v. Duratek, Inc., 67 F.App'x 169, 173–
74 (4th Cir. 2003).

In   Svezzese,   the   complaint   contained   six   general
allegations,  which,  plaintiffs  argued,  were  sufficient  to  meet
the   scienter   requirement:   "(1)   [defendant]   lacked   internal
controls;  (2)  [defendant]  violated  simple  accounting  rules;  (3)
[defendant]   violated   its   own   internal   revenue   recognition
policy;  (4)  [defendant's]  resulting  earnings  restatement  was  of
great  magnitude;  (5)  [defendant's]  accounting  fraud  occurred  at
its   principal   division;   and   (6)   [defendant]   routinely
understated expenses in a number of ways."   Id. at 173.

34

Affirming the district court's decision to dismiss, the Fourth Circuit reasoned that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim.  Only where such allegations are coupled with evidence of corresponding fraudulent intent, might they be sufficient."  See id. ("As should be apparent from this list, all of these allegations are, in essence, allegations of accounting irregularities and violations.   None of these allegations evidence fraudulent intent . . . .").  Perhaps most telling is that while Svezzese predates Tellabs, the Court was nevertheless, even upon a holistic review of the allegations, unwilling to find that plaintiffs had sufficiently pled sciener.   Id.  ("In sum, all of the allegations in the complaint, whether considered individually or collectively, fail . . . .").

In this case, Medifast, by its own admission and disclosure, failed to recognize revenue properly in fiscal years 2008 and 2009.  Lead Plaintiffs do not, however, allege with any particularity that Medifast knew over this time that its specific application of revenue recognition principles was in error.  Instead, as noted above, Lead Plaintiffs simply jump to the conclusion that because Defendants "were on notice of other weaknesses (e.g., the tax issues) as a result of [the 2009 10-K]" (Pls.' Opp'n at 14), they must have known about the GAAP

35

violations.    This  allegation,  like  others  contained  in  the
Amended  Complaint,  omits  specific  facts.    Lead  Plaintiffs  fail
to  allege  sufficient  particularized  facts  detailing  how  and  when
Defendants  knew  of  the  accounting  errors.

Moreover,  when  considered  with  the  fact  that  Medifast  and
its  external  auditors  were  in  agreement  during  this  period  as  to
the  application  of  revenue  recognition  principles—Bagell,  then
Freidman,  signed  off  on  the  Company's  financial  statements  in
both  2008  and  2009—Lead  Plaintiffs'  claim  is  further  undermined.

Lead  Plaintiffs  further  allege  that  the  relative
simplicity  of  the  accounting  principles  violated  in  this  case
lends  further  probative  weight  to  their  argument  that  the  GAAP
violations  in  this  case  raise  a  strong  inference  of  scienter.
Lead  Plaintiffs  cite  to  MicroStrategy,  which  states  that  "if  the
GAAP  rules  and  [internal]  accounting  policies  Defendants  are
alleged  to  have  violated  are  relatively  simple,  it  is  more
likely  that  the  Defendants  were  aware  of  the  violations  and
consciously  or  intentionally  implemented  or  supported  them,  or
were  reckless  in  this  regard."    115  F.Supp.2d  at  638.

It  should  be  noted,  however,  that  MicroStrategy  involved
allegations  not  present  here.    Namely,  that  the  company's
independent  accountant  was  complicit  in  the  fraud.    115
MicroStrategy,  F.Supp.2d  at  650-51.    As  with  Lead  Plaintiffs'
other  allegations  discussed  above,  the  case  law  holds  that

simplicity of the principles cannot, alone, raise a strong inference of scienter, but can only do so when combined with other allegations evincing fraudulent intent. See, e.g., id. at 638. In this regard the Amended Complaint is wanting. To be sure, the logical inconsistencies weigh against a finding of scienter.

As Defendants point out, it cannot at once be the case that the accounting errors were simple, clear-cut determinations *and*, at the same time, that the Company's independent auditors repeatedly failed to discover those "obvious" errors. (See Pls.' Opp'n at 18-19). In January 2010, Friedman succeeded Bagell. Friedman examined Medifast's historical accounting practices and disagreed with certain of Bagell's conclusions. But McGladrey, in conducting its audit of the Company's 2010 books, disagreed with both Medifast's internal controllers and Friedman about how the Company had recognized certain revenue in 2008 and 2009. Indeed, if Medifast's accounting errors were in fact so simple, then why did Medifast's independent auditors certify the accuracy of the financial statements each year? As Defendants astutely observe, if their financial statements were knowingly false, then their auditors must have either been complicit, kept in the dark, or negligent. Unlike MicroStrategy, Lead Plaintiffs make no such allegations. Such a glaring non sequitur undermines any inference of scienter.

### iii. Sarbanes-Oxley certifications

Lead Plaintiffs' assertion that Defendants McDevitt and Connors' Sarbanes-Oxley certifications support a strong inference of scienter is also misguided.

It is well established that scienter cannot be inferred from the signing of a Sarbanes-Oxley certification. See, e.g., Matrix, 576 F.3d at 177-78, 196 (dismissing Section 10(b) claim where allegations did not give rise to a strong inference of scienter, although individual defendants signed Sarbanes-Oxley certifications); Cozzarelli, 549 F.3d at 628 n.2 (dismissing Section 10(b) claims against company's CEO in part because plaintiffs' "bare allegation" that the CEO "lied when she certified . . . financial statements in accordance with the Sarbanes-Oxley Act of 2002 . . . does not provide independent support for an inference of scienter"); see also In re Constellation, 738 F.Supp.2d at 638 n.24 (finding that "plaintiffs' allegations that the officer defendants acted recklessly when they certified [defendant's] public filings in accordance with the Sarbanes-Oxley Act do not raise an inference of scienter").

In this case, Lead Plaintiffs allege that by signing the Sarbanes-Oxley certifications, Defendants McDevitt and Connors falsely stated that the financial statements were true in all material respects and that these statements were knowingly or

38

recklessly made.   In support of this contention, Lead Plaintiffs posit allegations, already addressed above, which they believe give rise to a strong inference of scienter.   Those allegations include: (1) a material weakness in Medifast's internal control over financial reporting (Am. Compl. ¶ 115); (2) ineffective remediation efforts concerning accounting of income taxes (Id. ¶ 116); (3) the duration of the alleged accounting fraud (Id. ¶ 120); and (4) GAAP violations (Id. ¶¶ 123-26).

As explicated above, the foregoing list of allegations fail because they are not coupled with particularized facts evincing fraudulent intent.   Said differently, the certification issue is wholly derivative of the underlying question: Did Defendants have a culpable state of mind when they made the underlying incorrect statement? Viewed holistically, the Sarbanes-Oxley allegation fails because Lead Plaintiffs do not plead facts indicating that Defendants intentionally misstated a material fact or acted recklessly.   Without that, there is no inference, much less a strong inference, that Defendants acted with the required scienter.

### iv.  Proximity in time between the misstatements and the disclosure of error

Lead Plaintiffs further argue that the closeness in time of Medifast's misstatements and the Company's later disclosure of error supports an inference of scienter.   As with Lead

Plaintiffs' myriad contentions, this allegation, considered holistically, fails to raise an inference of scienter.

It is well established in this Circuit that "[p]laintiffs may not rely simply on the discrepancy between a company's optimistic outlook and subsequent disappointing results to support a claim of fraud. Such allegations of fraud by hindsight do not satisfy the stringent requirements of the PSLRA." In re Criimi Mae, 94 F.Supp.2d at 662 (citing Hillson Partners Ltd. P'ship v. Adage, Inc., 42 F.3d 204, 209 (4th Cir. 1994)).

Here, Lead Plaintiffs argue that the short timeframe between Defendants' false statements in the January 12, 2011 2009 10-K/A, followed by a disclosure of the error on April 1, 2011, supports a finding of scienter. But without other particularized facts indicating what Defendants knew and how they knew it, this allegation, when considered holistically, is lacking. Without a doubt, to hold otherwise would allow a plaintiff to simply contrast a defendant's past optimism with less favorable actual results, and then contend that the differences must be attributable to fraud. The pleading standard demands more.

c. **Category III – allegations related to the Company's auditors**

i. **Friedman's dismissal and disclaimer of responsibility for the 2007 and 2008 financial statements**

The Amended Complaint also fails to give rise to a strong inference of scienter with regard to the allegation that Friedman was dismissed as the Company's auditor and disclaimed responsibility for the 2007 and 2008 financial statements.

In support of this assertion, Lead Plaintiffs cite two cases, both of which are inapposite to the instant case. Lead Plaintiffs first rely on In re OCA, Inc. Sec. & Derivative Litig., No. 05-2165, 2006 WL 3747560, at *22 (E.D.La. Dec. 14, 2006), for the proposition that a "[defendant's] history of dealing with its auditors contributes to the inference that [the] defendant[] [acted with scienter]." Id. But as is reasoned below, it is manifestly clear that Lead Plaintiffs' reliance on In re OCA is misplaced.

As a threshold matter, the In re OCA court did not, as suggested by Lead Plaintiffs, consider whether the defendants' change in auditors was indicative of scienter. Conversely, the court considered a host of allegations, wholly absent here, which gave rise to a strong inference of scienter. Among the factors supporting an inference of scienter were that: (1) Defendant OCA had, after terminating one independent auditor

41

under questionable circumstances, concealed information from its subsequent auditor and prevented it from conducting an investigation into alterations of accounting records; (2) OCA's new independent auditor had publicly stated OCA had failed to act following the discovery of potentially illegal acts and subsequently resigned; and (3) three confidential witnesses provided direct allegations of insider knowledge of the alleged misstatements. In re OCA, 2006 WL 3747560, at *6-8, 22.

It was against this milieu of contempt and deceit that the In re OCA court concluded: "[t]herefore, OCA's history of dealing with its auditors contributes to the inference that defendants [acted with scienter]." 2006 WL 3747560, at *23. Lead Plaintiffs' citation to the syllogism's conclusion without reference to the underlying premises renders the case inapplicable and unsupportive of their position.

Likewise, in the only other case Lead Plaintiffs cite on this issue, a magistrate judge in the Northern District of Texas recommended that the district court find scienter because the defendants' audit firm decided to terminate its relationship with the defendant at the same time as the company's legal counsel and two outside directors also terminated their relationships with the defendant company. See STI Classic Fund v. Bollinger Indus., Inc., No. 3-96-CV-823-R, 1996 WL 885802, at *2 (N.D.Tex. Oct. 25, 1996). The court found such a mass exodus

could be indicative of scienter. Id. Lead Plaintiffs make no attempt to distinguish such obviously contrary and inapt authority. Instead, Lead Plaintiffs gloss over the fact that it was the *audit firm* which decided to terminate its relationship with the targeted defendant, not vice versa.

Perhaps most telling, however, is that authority from within this Circuit is not to the contrary. In Mun. Mortg. & Equity, this Court held that plaintiffs failed to create a cogent or compelling inference that defendant had acted knowingly or recklessly. See In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig., 876 F.Supp.2d 616, 628, 644 (D.Md. 2012). This holding resulted despite plaintiffs' allegation that, among other things, defendant's outside auditor was dismissed at a time that was highly unusual and suspicious because it was only one month after defendant announced its second restatement. Id. at 628; (see Mun. Mort. & Equity, Am. Compl. at 129, ECF No. 45).

Moreover, even assuming arguendo this Court were to validate this allegation with an inference of scienter, the competing inference of non-fraudulent conduct is more compelling. Bagell, as Medifast's longtime auditor, certified the correctness of Medifast's application of accounting principles for 2006, 2007, and 2008. Bagell's successor, Friedman, conducted Medifast's 2009 audit. As noted above,

43

Friedman conducted the 2009 audit because it merged with Bagell immediately before the 2009 audit was to begin.   This timing provided Medifast with no alternative other than to accept Friedman as its independent auditor for FY 2009 or risk delaying its annual report.   Once that audit was complete, however, Medifast determined that Friedman was not a good fit for the Company.   In light of losing its longtime auditor Bagell, Medifast's audit committee was free to undertake a proper search for a suitable independent auditor.   Defendants ultimately selected McGladrey, a well-respected, national accounting firm. This competing inference, in the Court's judgment, serves as a more compelling narrative than the one offered by Lead Plaintiffs.

Also, Lead Plaintiffs gain no traction in attempting to establish a strong inference of scienter by alleging that Friedman disclaimed responsibility for the 2007 and 2008 financial statements.   As noted above, when Medifast originally filed its 2006, 2007, and 2008 financial statements, those statements were audited and certified by Bagell.   Lead Plaintiffs point to no authority, within this Circuit or otherwise, for the proposition that a company's failure to obtain a subsequent audit for restated financials predating the class period is indicative of scienter.

### d.  Category IV – allegations of insider trading

#### i.  Individual Defendants' stock sales during the Class Period

Lead Plaintiffs fail in their final salvo at establishing a strong inference of scienter on account of the Individual Defendants' stock sales.

Trading by public company directors or officers can imply scienter only if the timing and amount of the trading are "unusual or suspicious." Teachers' Ret. Sys., 477 F.3d at 184–85.  When considering whether the timing of an insider's sales is unusual, courts look at the defendant's history and pattern of stock sales, as well as whether the sales were made near the high point of the stock's sales price.  Id. at 184; see also In re E.Spire Commc'ns, Inc. Sec. Litig., 127 F.Supp.2d 734, 743 (D.Md. 2001) (granting the motion to dismiss because "[t]he mere pleading of insider trading without regard to either the context or the strength of the inferences to be drawn is not enough to support a strong inference of scienter").

Moreover, "even large stock sales are not probative of scienter unless they are significant in comparison to the total number of shares an insider holds." In re First Union Corp. Sec. Litig., 128 F.Supp.2d 871, 898 (W.D.N.C. 2001) (citation omitted).  Additionally, where a defendant's net ownership of shares increases, the inference of scienter is negated.

Cozzarelli, 549 F.3d at 622, 628 (declining to find a strong inference of scienter in part because despite stock sales, all three defendants actually increased their net holdings in the company through the acquisition of vested stock options). Likewise, "[s]tock sales pursuant to Rule 10b-5 trading plans can raise an inference that the sales were prescheduled and not suspicious." In re Constellation, 738 F.Supp.2d at 638 (citation and internal quotation marks omitted).

In this case, a close examination of the Individual Defendants' history of stock trading, along with other factors outlined below, indicates that the timing and amount of their trades were neither suspicious nor unusual. Individual Defendants' comprehensive trading history is reproduced below:

Stock Ownership and Trading History of Defendant McDevitt[12]

| Date | Issuer | Form | Trans. | Shares | Owned |
|------|--------|------|--------|--------|-------|
| 2011-03-30 | MEDIFAST, INC. | 14A | -- | -- | 358,346 |
| 2011-01-05 | MEDIFAST, INC. | 4 | Sale | 95,000 | 340,012 |
| 2009-12-28 | MEDIFAST, INC. | 4 | Sale | 30,000 | 308,679 |
| 2009-08-24 | MEDIFAST, INC. | 4 | Sale | 100,000 | 323,784 |

---

[12] See Richards Decl. Ex. D, ECF No. 28-6 (attaching Medifast, Inc. Ownership Information for MCDEVITT, MICHAEL, U.S. Securities and Exchange Commission, available at http://sec.gov/cgi-bin/own-disp?action=getowner&CIK=0001225012).

Stock Ownership and Trading History of Defendant Connors[13]

| Date | Issuer | Form | Trans. | Shares | Owned |
|------|--------|------|--------|--------|-------|
| 2011-03-30 | MEDIFAST, INC. | 14A | -- | -- | 93,484 |
| 2011-01-05 | MEDIFAST, INC. | 4 | Sale | 20,000 | 91,484 |
| 2009-08-24 | MEDIFAST, INC. | 4 | Sale | 12,500 | 77,009 |
| 2004-12-28 | MEDIFAST, INC. | 4 | Sale | 5,000 | 78,484 |

Stock Ownership and Trading History of Defendant MacDonald[14]

| Date | Issuer | Form | Trans. | Shares | Owned |
|------|--------|------|--------|--------|-------|
| 2011-03-30 | MEDIFAST, INC. | 14A | -- | -- | 635,148 |
| 2011-01-05 | MEDIFAST, INC. | 4 | Sale | 50,000 | 579,521 |
| 2010-05-18 | MEDIFAST, INC. | 4 | Gift | 20,000 | 476,981 |
| 2008-10-16 | MEDIFAST, INC. | 4 | Award | 1,000 | 849,550 |
| 2007-11-30 | MEDIFAST, INC. | 4 | Award | 10,000 | 839,550 |
| 2006-10-31 | MEDIFAST, INC. | 4 | Exempt | 26,667 | 602,748 |
| 2006-10-31 | MEDIFAST, INC. | 4 | Exempt | 26,667 | 0[15] |

---

[13] See Richards Decl. Ex. E, ECF No. 28-7 (attaching Medifast, Inc. Ownership Information for CONNORS, BRENDAN, U.S. Securities and Exchange Commission, available at http://sec.gov/cgi-bin/own-disp?action=getowner&CIK=0001369717).

[14] See Richards Decl. Ex. E, ECF No. 28-8 (attaching Medifast, Inc. Ownership Information for MACDONALD, BRADLEY T., U.S. Securities and Exchange Commission, available at http://sec.gov/cgi-bin/own-disp?action=getowner&CIK=0001213229).

[15] Defendant MacDonald has an extensive trading history in Medifast common stock. Transactions prior to October 2006 were omitted.

Stock Ownership and Trading History of Defendant Sheetz[16]

| Date | Issuer | Form | Trans. | Shares | Owned |
|---|---|---|---|---|---|
| 2011-03-30 | MEDIFAST, INC. | 14A | -- | -- | 273,692 |
| 2011-01-05 | MEDIFAST, INC. | 4 | Gift | 10,000 | 278,692 |
| 2011-01-05 | MEDIFAST, INC. | 4 | Sale | 15,000 | 263,692 |
| 2010-06-01 | MEDIFAST, INC. | 4 | Sale | 10,000 | 273,692 |
| 2010-05-27 | MEDIFAST, INC. | 4 | Gift | 10,000 | 283,692 |
| 2009-12-23 | MEDIFAST, INC. | 4 | Gift | 1,500 | 211,400 |
| 2009-12-03 | MEDIFAST, INC. | 4 | Sale | 10,000 | 212,900 |
| 2009-08-25 | MEDIFAST, INC. | 4 | Sale | 25,000 | 197,900 |
| 2009-08-21 | MEDIFAST, INC. | 4 | Sale | 50,000 | 222,900 |
| 2006-07-06 | MEDIFAST, INC. | 4 | Gift | 10,000 | 92,900 |
| 2006-05-16 | MEDIFAST, INC. | 4 | Sale | 50,000 | 137,605[17] |

Parsing these data, modest scrutiny reveals the rather innocuous nature of these sales. First, as to Defendant McDevitt, Lead Plaintiffs correctly allege that he sold 95,000 shares of Medifast common stock on January 5, 2011. That sale represented 22% of the Medifast stock he owned as of that date. But Defendant McDevitt's short trading history also included a prior sale of 100,000 shares less than eighteen months before

---

[16] See Richards Decl. Ex. E, ECF No. 28-9 (attaching Medifast, Inc. Ownership Information for SHEETZ, MARGARET MACDONALD, U.S. Securities and Exchange Commission, available at http://sec.gov/cgi-bin/own-disp?action=getowner&CIK=0001224955).

[17] Defendant Sheetz has an extensive trading history in Medifast common stock. Transactions prior to May 2006 were omitted.

the alleged suspicious sale of 95,000 shares on January 5, 2011.
Indeed, the sale of 100,000 shares represented 24% of his
holdings.   On balance, a sale of 95,000 shares is hardly
"unusual."  Moreover, as indicated by the table above, Defendant
McDevitt's ownership of Medifast common stock actually increased
over the Class Period, thus negating any inference of scienter.

Second, as to Defendant Connors, Lead Plaintiffs accurately
allege that he sold 20,000 shares of common stock on January 5,
2011.   That sale represented 18% of his holdings as of that
date.  But any inference of scienter is clearly eviscerated by
the fact that his common stock holdings over the Class Period
increased from 77,009 shares shortly before the Class Period
began, to 93,484 shares by the end of the Class Period.

Third, as to Defendant MacDonald, Lead Plaintiffs properly
allege that he sold 50,000 shares on January 5, 2011, amounting
to less than 8% of his holdings as of that date.   As with
Defendants McDevitt and Connors, however, any inference of
scienter is refuted by the fact that his common stock holdings
over the Class Period mushroomed from 477,000 shares shortly
after the Class Period began, to over 635,000 shares by the end
of the Class Period.

Fourth, as to Defendant Sheetz, Lead Plaintiffs rightly
allege that she sold 15,000 and 10,000 shares on January 5,
2011, amounting to 8% of her holdings as of that date.   While

her holdings did not increase over the Class Period, Defendant Sheetz had an unremarkably consistent, regular schedule of stock sales.  All things considered, the January 5, 2011 sales were undeniably consistent with her earlier sales in both timing and amount.

Further mitigating any possible remaining inference of scienter is the fact that Defendants explicitly disclosed Individual Defendants' plan to sell a portion of their stock for tax purposes.  The Company's notice stated as follows:

> The Compensation Committee of Medifast, Inc. has utilized vested stock grants as a major source of compensation for its senior executive team so that their interests are aligned with Shareholders by building value in the Medifast Brand and increasing shareholder value.  ***The Senior Executive Team continues to earn stock grants over the next five years and must pay an increasingly higher tax rate on their illiquid restricted stock grants.  Therefore, over the next 12 months, the CEO, President and the VP of Finance plan on selling shares of Medifast Common Stock up to approximately 200,000 shares for tax and estate purposes in accordance with the Medifast, Inc. Insider Trading Policy*** as outlined below in "Item 5 – Other Information."[18]

---

[18] The text of the Medifast, Inc. Insider Trading Policy provides, in relevant part that:

> In March 2003, the Company implemented a Trading Policy whereby if a director, officer or employee has material non-public information relating to the Company, neither that person nor any related person may buy or sell securities of the Company or engage in any other action to take advantage of, or pass on to others, that information. Additionally, on October 16, 2006 the Board of Directors approved an updated trading policy in which insiders may purchase or sell MED securities if such purchase or sale is made 7

(Defs.' Reply Decl. Ex. D, at 10, ECF No. 32-5) (emphasis added).  The Company made a markedly similar disclosure on May 10, 2010.  (See id. Ex. E, at 19, ECF No. 32-6).  While these disclosures lack the hallmark specificity of stock sales made pursuant to Rule 10b-5 trading plans,[19] the disclosures, nonetheless, plainly put the Company's shareholders on notice that Company officers would engage in stock sales over the coming year for tax purposes.

To summarize, none of the Individual Defendants sold stock in an amount that was unusual or suspicious in comparison to their prior trading histories or to case law.[20]  That the total

---

days after or 14 days before an earnings announcement to include the 10-K or 10-Q in order to insure that investors have available the same information necessary to make investment decisions as insiders.
(Defs.' Reply Decl. Ex. D, at 18).

[19] See Rule 10b5-1, 17 C.F.R. § 240.10b5-1 (2012) (outlining the specificity of a trading plan necessary to establish that a purchase or sale of a security was not done on the basis of material, nonpublic information).

[20] While there is no bright-line test as to an amount or percentage of holdings that must be sold to give rise to a strong inference of scienter, courts finding no inference of scienter in cases involving similar and far greater percentages of sales are, by comparison, legion.  See Cozzarelli, 549 F.3d at 627-28 (sale of 11% and 13% were de minimus); In re CIENA Corp. Sec. Litig., 99 F.Supp.2d 650, 663 (D.Md. 2000) (sale of 28% not suspicious); Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 368 (5th Cir. 2004) (sales of 26%, 27%, and 33% by three different defendants on the same day did not raise a strong inference of scienter); Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001) (sales of 10% and 17% of holdings were not suspicious); In re Skechers U.S.A., Inc.

holdings of three of the four Individual Defendants increased during the Class Period hardly suggests that they sought to dump their shares at an inflated price.[21]   Similarly, it strains credulity, to allege, as Lead Plaintiffs do here, that the Individual Defendants were engaging in a nefarious scheme to inflate the price of Company stock for their own benefit while simultaneously making a public disclosure of their intention to sell shares far in advance.

---

Sec. Litig., 273 F.App'x 626, 628 (9th Cir. 2008) (sale of 42% not suspicious); In re Keyspan Corp. Sec. Litig., 383 F.Supp.2d 358, 382-83 (E.D.N.Y. 2003) (sale of 20% of holdings cannot raise strong inference of scienter); Malin v. XL Capital Ltd., 499 F.Supp.2d 117, 153 (D.Conn. 2007) (sales of 7%, 14%, and 31% of total stockholdings were not unusual); In re eSpeed, Inc. Sec. Litig., 457 F.Supp.2d 266, 291-92 (S.D.N.Y. 2006) (sales of 11% and 17% of holdings were not unusual); but see In re Oxford Health Plans, Inc. Sec. Litig., 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (sale of 11% of holdings is significant for purposes of scienter); In re Orbital Scis. Corp. Sec. Litig., 58 F.Supp.2d 682, 686 (E.D.Va. 1999) (sale of 15% prior to negative announcement "unusual and suspicious").
   [21]   Lead Plaintiffs attempt to distinguish Individual Defendants' stock sales on the grounds that the stock holdings increase was due to vested stock options as opposed to an actual purchase of stock.   This argument is without merit.   See Cozzarelli, 549 F.3d at 622 (recognizing the nullifying effect of an increase in stock holdings through the acquisition of vested stock options).

### III. CONCLUSION

For the foregoing reasons, the Court will, by separate Order, GRANT Defendants' Motion to Dismiss[22] (ECF No. 28) Lead Plaintiffs' Amended Complaint (ECF No. 25).

Entered this 28th day of March, 2013

/s/

_____
George L. Russell, III
United States District Judge

---

[22] "A claim of control person liability must allege a predicate violation of Section 10(b)." In re Mun. Mortg., 876 F.Supp.2d at 647 (citing In re Mut. Funds Inv. Litig., 566 F.3d at 129, rev'd on other grounds by Janus Capital Grp., Inc. v. First Derivative Traders, 131 S.Ct. 2296 (2011). Thus, "where a plaintiff has failed to state a viable underlying securities violation, no . . . § 20(a) violation exists." In re Constellation, 738 F.Supp.2d at 639. As explained above, Lead Plaintiffs have failed to adequately plead a violation of Section 10(b) or Rule 10b-5. Accordingly, their Section 20(a) claim against Defendants must be dismissed as well.